hLANDRIEU, Judge.
Appellant, Helmer Directional Drilling, Inc. (“Helmer”), filed suit against Dexco, Inc. (“Dexco”) for non-payment of directional drilling services and materials which Helmer provided in connection with drilling of Dex-co’s Vaccaro Well # 2 located in the Diamond Field of Plaquemines Parish, Louisiana.[1] Helmer also sought recognition of a privilege under the Oil Well Lien Act.[2] Fidelity and Deposit Company of Maryland bonded the property and was subsequently added as a party defendant in an amending petition.
Dexco answered generally denying the allegations and filed a reconventional demand alleging that as a result of Helmer’s improper performance of its contractual obligations it would be required to drill a new and separate well in order to obtain the geological targets that it had wanted with the directional drilling contract.[3] Specifically, Dexco alleged, that through |2the negligence of plaintiffs employee the directional well was drilled in the wrong direction and even after that error was corrected the well again was drilled in the wrong direction.
Helmer filed an Exception of Prescription to Dexco’s reconventional demand claiming that it was prescribed by the one year pres- *1247 eriptive period for torts. Fidelity and Guaranty Company of Maryland denied Helmer’s allegations against Dexeo, adopted Dexco’s response to Helmer’s petition, and filed a Third Party Demand for indemnity against Dexeo and the individual investors in the well; that third party action was resolved by compromise.
Regarding the exception of prescription, the trial court determined it was not well founded. In its reasons for judgment, the trial court noted that although the pleadings were couched in terms usually associated with tort pleadings, this was really a suit over a breach of contractual obligations and the prescriptive period is ten years.
The trial court also rendered judgment in favor of Dexeo and against Helmer dismissing its petition and awarded Dexeo $241,439 on its reconvention. That damage award consisted of $20,936 for the cost of drilling the well in the wrong direction for two and one-half days and $220,503 for the cost of drilling a new well to and through the horizons sought by Dexeo but missed by Helmer. Here, the trial court noted in its reasons for judgment that Helmer, through Mike Kelsey, negligently performed the directional drilling contract by failing to perform its services in an expert, skillful, careful, diligent and good workmanlike manner. Helmer appeals this judgment.
IgHelmer reasserts its Exception of Prescription, appeals the dismissal of its suit for non-payment of invoices against Dexeo, and appeals the trial court’s award of damages to Dexeo on reconventional demand.
FACTS
Dexeo, Inc., the operator of the Vaccaro Well No. 2 in Plaquemines Parish, Louisiana, contracted with Helmer Directional Drilling, Inc. to directionally drill a well through vertical and horizontal objective zones designated by Dexeo. Helmer drew up a proposal depicting the two drilling objectives it undertook and the proposed bottom hole location.[4] Helmer was allowed a zone of deviation around each zone indicating the outer tolerance that the directional driller was allowed to drill. The contracting parties agreed that Helmer was being hired to drill, and would drill, a directional well that would penetrate the zones around objectives 1 and 2 at the agreed vertical depths of 9,510' and 9,825', respectively. The parties further agreed that Helmer would drill as close as possible to the proposed bottom hole location. Hel-mer specifically contracted to perform its directional drilling work to the “best of [its] skill and ability,” as printed in its Work Order and Job Tickets delivered to the drilling consultant at the job site.
Helmer relies on language in the invoices in contending that it did not guarantee the results to be obtained from the running of any deflection tool, bits, or any other instrument or tools and that the customer assumed full responsibility for any and all loss and damages, regardless of its nature. That language specifically stated that Helmer would not be held liable for injuries Uto persons or property arising from any cause whatsoever in the performance of the directional drilling services. Helmer asserts that this language relieves it of any liability or responsibility to Dexeo even if it did improperly drill the well.
Dexeo, on the other hand, contends that this language merely limits Helmer’s liability as a result of the use of any particular tool since Helmer did not manufacture the tools to be used in the drilling operation. Dexeo further asserts that Helmer was bound to use its best efforts to perform its directional drilling services in an expert, skillful, careful, diligent, and good workmanlike manner.
Dexeo claims that Helmer failed to use its best efforts to perform its services in an expert, skillful, careful, diligent, and good workmanlike manner. Dexeo further asserts that the directional driller on site, Mike Kelsey, was negligent, inattentive, or incompetent. Testimony revealed that Mr. Kelsey *1248 was absent from the rig floor for a substantial portion of his time. Additionally, he took directional surveys less frequently than they should have been taken according to expert testimony. Specifically, the experts for both sides agreed that during mud motor drilling the directional driller should take surveys every 30', at the making of every connection of pipe, in order to monitor and correct the orientation of the pipe and bottom hole assembly and to maintain and correct the direction of the hole. Mr. Kelsey took surveys approximately every 60 feet.
As a result of Kelsey’s improper running of the drilling job the hole quickly turned in the wrong direction and continued in that direction for at least three (3) days. This lapse resulted in the first objective being missed by a substantial margin. At one point a Mr. Steve Gaspard of Helmer came on the location to “give Kelsey some rest.” While Gaspard was there, the error in |5the direction of the hole was corrected. But upon Gaspard’s departure and Kelsey’s reassuming responsibility for the hole, the hole once again took on a wrong direction. Hel-mer denies that Kelsey was responsible for the direction of the hole and that Gaspard was responsible for correcting the direction of the hole. Helmer claims that the wrong direction of the hole was not due to any fault of Kelsey and that the direction had already been corrected by the time Gaspard came to the rig. The trial court found the fact that Kelsey was no longer employed by Helmer at the time of the trial to be compelling evidence of Helmer’s dissatisfaction with his job performance. Helmer refutes this conclusion claiming that Kelsey was laid off as a result of the collapse of the oil industry beginning in 1984. But, Gaspard was still employed by Helmer at the time of the trial even though he had been with the company for a considerably shorter period than Kelsey.
Finally, Helmer maintains that it completed the contract for services and claims entitlement to payment of the invoice for $26,-728.35. Entitlement to the invoice amount is based on Helmer’s assertions that the bottom hole location was not a target, that Dexco modified the agreement as to the first target, and that they hit the second target. Helmer claims that its obligation to hit the first target was modified with Dexco’s knowledge and consent on June 20, when the directional well was still above the first target and Dex-co would not authorize an additional mud motor run recommended by Kelsey and Gas-pard. Helmer also claims that on June 21, Dexco rejected Helmer’s recommendation of an additional directional tool run. Helmer maintains that Dexco’s refusal to incur an additional $10,000 to $20,000 expense resulted in a modification of Helmer’s proposal for the first target.
Alternatively, Dexco points to evidence that by the time Helmer raised the possibility of an additional mud motor run, the directional hole had already Ureached “the point of no return.” At that juncture, the hole could not feasibly have been turned enough to reach the first objective zone even with another mud motor run, steering tool, or any other tool. Moreover, Kelsey himself reluctantly admitted that the loss of direction after the washing and reaming and before James C. Severson, Dexco’s President, arrived, was what “killed” the hole. On the afternoon of June 21, 1983, the hole had, according to Kelsey, already reached the point of no return. Dexco denies that there was any modification of the agreement and claims that given Kelsey’s earlier defective performance, Severson did not believe that Kelsey would achieve the first zone with any additional directional tool. Moreover, Dex-co’s authority for expenditure had been exceeded such that it could not pay another $20,000 for another time-consuming and futile mud motor run. Dexco therefore had no viable alternative but to follow Kelsey’s recommendation which he projected would allow him to significantly penetrate the second objective zone and which would be drilled close to the proposed bottom hole location.
DISCUSSION
With the exception of its prescription argument, Helmer’s arguments turn to disagreements with the trial court’s findings of fact. A court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Stobart v. State Through DOTD, *1249 617 So.2d 880, 882 (La.1993) (citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)). If the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-83.

^MODIFICATION OF AGREEMENT

Helmer contends that any obligation it had to hit the first target was modified with Dexco’s knowledge and consent on June 20, when the directional well was still above the first target and Dexco would not authorize the additional mud motor run recommended by Kelsey and Gaspard. Again on June 21, after the angle building assembly had been run, Severson rejected Helmer’s recommendation of an additional directional run and instead instructed Helmer to run a packed hole assembly knowing that this would result in the first target being missed. Helmer argues that rather than incur another $10,-000 to $20,000 expense, Dexco modified Hel-mer’s proposal for the first target, and therefore, Helmer should not be held accountable for missing that target.
We disagree and accordingly find that the trial court was not manifestly erroneous in concluding that there was no “modification” in the agreement between Helmer and Dexco. After hearing reports of Gaspard’s leaving and Kelsey’s immediate loss of 10 degrees of direction, Severson went to the well site on the afternoon of June 21,1983, to assess the situation firsthand. After he arrived, Severson learned that there was a dramatic loss in direction over a short period of time, within the last 100 feet there was a loss of 10 degrees in direction from 81 East to 71 East. According to Kelsey, this loss of 10 degrees in direction was caused by washing and reaming the hole. When Kelsey proceeded to run the angle building assembly, it got stuck in the hole and it became necessary to wash and ream the hole so that the angle building assembly could be returned to the bottom of the hole previously drilled with the directional mud motor. Pri- or to the running of the angle building assembly, Kelsey should have run a hole opener to open the hole; this would have | gprevented the angle building assembly from getting stuck in the hole. It was at this point that Dexco realized Helmer was not going to hit the first target.
Having already exceeded its authority for expenditure allowed by its investors[5] and considering Kelsey’s previous substandard performance, Dexco could not afford to run the risk of another unsuccessful mud motor. Instead, it sought to minimize the damage at this point and the least risky alternative was to put on a packed hole assembly so as to keep the direction of the hole.

CLEARLY ERRONEOUS FINDINGS

Helmer contends that the trial court’s conclusion that Helmer, through Kelsey, negligently or incompetently directionally drilled the well is based on clearly erroneous fact finding. First, Helmer argues that the trial court committed manifest error in finding that “[a]s a result of Kelsey’s improper running of the drilling job the hole quickly turned in the wrong direction and continued in that direction for at least three (3) days.” Next, Helmer asserts that the trial court committed manifest error when it found that “the error in the direction of the hole was corrected” while Gaspard was there. Third, Helmer submits that the trial court was clearly wrong when it found “upon Gaspard’s departure and Kelsey assuming responsibility for the hole again, Gaspard’s good work was soon overcome and the hole took on the wrong direction.” Fourth, Helmer argues that the trial court committed manifest error when it found that the directional hole was negligently and incompetently drilled by Kelsey. Helmer further asserts that the trial court’s findings of fact are erroneous in that the court stated that “Kelsey spent a substantial portion of his time in the ‘dog house’ and not on the rig floor.”
IgAfter a thorough review of the record, we adopt the reasons for judgment stated by the *1250 trial court, and thus, find no manifest error in these rulings.

ERRONEOUS AWARD OF DAMAGES

Helmer contends that the trial court committed manifest error in awarding Dexco $20,936 for the cost of drilling the well in the wrong direction for 2-⅜ days. Helmer submits that the IADC (Industrial Association of Drilling Contractors) reports and the testimony of Harvey Fitzpatrick, Dexco’s expert witness, show only 14 hours of directional drilling in the wrong direction before Kelsey was able to turn the well toward the correct direction on June 17. Therefore, in the alternative, Helmer contends that the award should be reduced to $4,885.02.
After reviewing the record, we cannot say the trial court was clearly wrong when it awarded Dexco $20,936 in damages. That amount represented the 62 hours of rig time and tool expense lost after Kelsey failed to wipe out the bad run on June 15, 1983. The evidence establishes that Kelsey drilled in a westerly (wrong) direction for 2½ days before he was able to turn the well back in the proper direction. That lost rig time cost Dexco $20,936 in operation expenses.
Helmer next contends that the trial court’s finding that Dexco is entitled to $220,-503 for the cost of drilling a new well is clearly erroneous because Helmer’s well bore hit the second target at the Big 2-D Sand and Dexco consented that the first target at the Big 2-A Sand could be missed as Hel-mer’s well bore was sufficiently close. (When Dexco instead chose to run the angle building assembly, the first directional target could not be reached because the direction of the well could not be controlled.) Dexco’s witnesses, Fitzpatrick and Severson, confirmed that Helmer hit the second directional target. And, |i0Norton,[6] Kelsey, Gaspard and Fitzpatrick established that the bottom hole location on Helmer’s proposal was not a directional target.
The drilling of the Vaecaro Well # 2, as a straight hole, commenced on June 2, 1983. The straight hole drilling went down to a depth 9,996 feet, resulting in a dry hole. After logging the well on June 13th, and realizing the position they had obtained was not on the structure, but west of the desired position, Dexco contracted with Helmer to sidetrack the well in order to salvage the operation. Two objectives were designated by Dexco as the targets, the Big 2-A Sand and the Big 2-D Sand. Mike Kelsey, Hel-mer’s man on the job, commenced sidetracking the well at a depth of 7,950 feet on June 15th. Although Kelsey clearly missed the first objective by approximately 35 to 40 feet, he did, in fact, hit the second objective. The proposed bottom hole, which was missed by in excess of 300 feet, was not a target.
The trial court concluded that Dexco was entitled to the cost of drilling a new well and awarded $220,503 in damages to cover the cost of drilling this well. We believe the award to be clearly excessive. Helmer hit one of its two objectives. We therefore award Dexco 50 percent of the cost of drilling a new well, or $110,251.50 in damages.

ERRONEOUS DENIAL OF HELMER’S RECOVERY

contends it should have been compensated for its services. Specifically, Helmer argues that because it did not breach any duty owed to Dexco, it is entitled to an award of $26,728.35 for the directional ser-serand | utools furnished to Dexco for the Vaccaro Well # 2. After all, the directional well bore passed through the second target.
As Dexco had been severely damaged from Helmer’s defective performance, the trial court was not clearly wrong in dismissing Helmer’s principal demand. Accordingly, this assignment of error is without merit.

PRESCRIPTION

Here, Helmer contends that the trial court erred in applying the ten year prescriptive period applicable to actions for breach of contract in holding that Helmer’s employee, *1251 Kelsey, improperly or incompetently performed Ms duties as a directional driller. Helmer submits that the trial court’s award in favor of Dexco on its Reconventional Demand was based upon the delictual allegations of Dexco’s Reconventional Demand to wMeh the one year prescriptive period is applicable.[7]
Helmer concedes that Dexco’s Reconven-tional Demand asserted both breach of contract and negligence allegations against Hel-mer. In Paragraph XI of the Reconventional Demand, Dexco specifically alleged that it orally entered into the directional drilling contract pursuant to which Helmer “warranted that it would directionally drill toward and ‘hit’ three pre-designated subsurface ‘targets’, or come witMn pre-agreed acceptable distances of these ‘targets’ ”. In Paragraph XVI of the Reconventional Demand, Dexco further alleged that Helmer missed the three targets wMch it had warranted to hit. The nature of these allegations are distinguishable from the allegations of: (1) Paragraph XIII where Dexco alleged that through the negligence of Mike Kelsey the directional well was being drilled in the wrong direction; (2) Paragraph XV where Dexco contended that Kelsey fraudulently misrepresented that the well l^was being drilled in the proper direction; and (3) Paragraph XVII where Dexco asserted that it would be required to redrill a new and separate well solely because of the negligence and fraudulent misrepresentations of Helmer through its employee, Mike Kelsey.
The trial court determined that the gravamen of the reconventional demand was that the plaintiff, Helmer, improperly performed its contractual obligations to Dexco. Although the pleadings were couched in terms usually associated with tort pleadings, tMs is actually a suit over a breach of contractual obligations. Therefore, the trial court determined that the proper prescriptive period is the 10 year period as opposed to the one year delictual prescriptive period. We find no manifest error in this ruling. Accordingly, tMs assignment of error is without merit.
CONCLUSION
We find the trial court abused its great discretion when it awarded Dexco $220,503 to drill a new well; therefore, we reduced that amount in damages to $110,251.50. The remainder of the judgment of the trial court is affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.

. Helmer sought to recover $26,728.35 for its services and tools provided to Dexco over the period of June 14 through June 25, 1983.

. La.Rev.Stat.Ann. § 9:4861 (West 1991).

.Dexco's reconventional demand sought damages in the amount of $500,000 for Helmer’s alleged negligence, fraudulent misrepresentation and breach of contract with respect to the directional drilling services provided.

. There are three components to a drilling objective: (1) depth; (2) displacement; and (3) direction. According to Helmer’s proposal, the first objective had a horizontal displacement of 400' and a true vertical depth (TVD) of 9,510'. The second objective had a horizontal displacement of 539' and a TVD of 9,825'. Lastly, the proposed bottom hole had a horizontal displacement of 961' and a TVD of 10,780'. The direction for the two objectives and the proposed bottom hole was South 70 degrees East (S — 70— E).

. Helmer's authority for expenditure (“AFE”) was $67,000, and at this juncture, they had already expended $157,000.

. Michael Norton was the Owner and President of World Wide Drilling Consultants (World Wide), the drilling consultant on this particular well. Mr. Norton was a friend and business associate of Dean Hebert, Vice-President and Operational Manager of Helmer, and recommended Helmer. World Wide conveyed the corresponding drilling coordinates to Helmer who, in turn, drew up a proposal depicting the drilling objectives it undertook.

. La.Civ.Code Ann. art. 3492 (West pre-1992 amendment).